Mrs. Claire Phillips CLAVIER

v.

The UNITED STATES.

No. Cong. 2–52.

United States Court of Claims.

July 12, 1957.

Frederic W. Young, Portland, Or., for plaintiff. Frank S. Sever, Portland, Or., was on the brief.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a Congressional reference case. It involves reimbursement for food, medicine, supplies, and funds which plaintiff claims she furnished certain guerrilla forces which were operating in the Philippine Islands in the aid of the United States during World War II.

Plaintiff's petition was filed pursuant to U. S. Senate Resolution 293, adopted March 24, 1952, which reads as follows:

> "*Resolved,* That the bill (S. 911) for the relief of Mrs. Claire Phillips Clavier, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal, or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant: *Provided, however,* That the passage of this resolution shall not be construed as an inference of liability on the part of the Government of the United States."

Defendant denies all the allegations in plaintiff's petition except that she operated a night club in Manila during the Japanese occupation of the Philippine Islands. It asserts that plaintiff's claims are completely without foundation.

The evidence was taken before George H. Foster, one of our trial commissioners, who heard the witnesses and examined the documents in the case.

With slight additions we have adopted his findings, which are as follows:

1. Plaintiff was born in Michigan on December 8, 1907. Her parents were named DeLaTaste but later her mother remarried one Jess Snyder and plaintiff was thereafter sometimes known as Claire M. Snyder.

Early in plaintiff's life, she left high school to enter the entertainment field. In 1937 or 1938 she went to the Philippine Islands, where she was married to one Manuel Fuentes on August 15, 1939. Her husband was then a steward on an interisland steamer. The couple lived in Manila where they had one child, a girl whom they named Dian.

In 1941 plaintiff returned with her child to the United States to visit her stepfather and mother who were residing in Portland, Oregon. In September 1941 she returned to Manila with her child.

2. Plaintiff left Manila about December 10, 1941, and went to the Province of Bataan with one John V. Phillips, a sergeant in the 31st United States Infantry, which regiment had been transferred from Manila to Bataan after the war began. She later claimed she married Sergeant Phillips on December 25, 1941, in Bataan. In explanation of her marriage to Phillips, plaintiff stated, as a witness in this case, that her marriage to Fuentes had been annulled by one Judge Roxas, who was related by marriage to her husband, Manuel Fuentes. Later, again, as a witness, plaintiff stated that she was free to marry Phillips as she had been told a few days after the war began that her husband, Fuentes, had lost his life when the ship on which he was steward had been sunk.

3. There is no corroboration of her testimony that she was married to Phillips. According to his letters, written to his mother during the last stages of the war in Bataan, the sergeant did not mention such a marriage. Sometime in 1945, while plaintiff was residing in San Francisco with her husband, Manuel Fuentes, she made claim upon the War Department for payment of the six months' gratuity pay for death of a soldier in service, claiming to be the widow of Sergeant John V. Phillips. As the sergeant had designated his mother as his principal beneficiary, the War Department called upon plaintiff to furnish proof of her marriage to him. Plaintiff replied that she was unable to furnish proof and waived her claim in favor of the sergeant's mother. The War Department advised plaintiff that, if she were the widow, her claim was superior to that of the mother and a waiver could not be accepted. After investigation, the War Department paid the six months' pay to Sergeant Phillips' mother.

Plaintiff had rejoined her husband, Manuel Fuentes with whom she lived in San Francisco from about July 1945 to January 1, 1946, where they jointly purchased property in August 1945. Their daughter, Dian, lived with them. On April 25, 1947, plaintiff obtained a divorce from Manuel Fuentes in Portland, Oregon.

4. Sometime in January 1942, when the United States Army had gone into a defensive position on the Bataan peninsula, plaintiff remained in hiding in the northern part of that province until she became ill. She sent her daughter to the home of Judge Roxas in Manila with a request that he endeavor to secure a pass for her to return to that city. The judge declined her request, deeming it inadvisable to show a friendly interest in an American. Later plaintiff secured a pass from Japanese authorities to return to Manila as a Filipina. She arrived there in June or July 1942, where she stayed in the home of Judge Roxas for some two months, convalescing from an illness she suffered as a result of her stay in Bataan. Through the influence of Judge Roxas, she was granted a pass as the wife of Manuel Fuentes which entitled her to remain outside the internment camp in which most American and allied nationals were then detained. This was granted, after the Japanese authorities were assured that she was an American married to a Filipino and a

bonafide resident of Manila, on the condition that she continue living in the house of Judge Roxas and refrain from performing any act showing hostility to the Japanese Armed Forces.

5. After she had recovered from her illness, she left the home of Judge Roxas and took a position as a hostess in a night club which was then operating in Manila, catering especially to the Japanese. As a hostess she received no pay, her sole remuneration coming from the price of drinks bought for her by the patrons of the club to whom she acted as hostess. Such drinks were limeades for which the club charged the patron 2 pesos, 50 centavos of which were later paid to the hostess.

6. After four or five months of such work in the club, she opened a nightclub called the Tsubaki Club. This establishment also catered to Japanese officers and civilian Japanese, serving drinks but no meals. Plaintiff continued management of this club until May 22, 1944. During all this time she was known to her associates as Dorothy Fuentes.

7. Commencing about January 1943, plaintiff sent from time to time, money and supplies to one John Boone, a corporal in the 31st Infantry, who had lost contact with his military command and had evaded capture when the United States forces retreated southward on Bataan Province. Plaintiff had met Boone in northern Bataan before she returned to Manila and later had some contact with him through friendly Filipinos.

Boone is officially recorded in the Department of the Army as having been missing in action May 7, 1942, which was the date of surrender of the United States forces in the Philippines. While hiding out in the northern part of Bataan Province, he contacted natives residing in the province and ultimately had a loosely organized group, which prior to the time of liberation, engaged in no combat with the Japanese, and, being without communication facilities, performed no intelligence work. After the landing of United States forces in northern Luzon, the members of this group attached themselves to the liberating forces and were recognized as guerrillas from the date of such attachment in February 1945.

8. The main contact between Boone and plaintiff was a Filipina, whose home was in northern Bataan, to whom Boone was later married. She made a trip to Manila about once a month or once each two months, and the money and supplies furnished through the efforts of plaintiff were conveyed to Boone by this Filipina. Plaintiff's contributions to Boone were principally food and medicine, and purely personal things for use of Boone, his wife, and his wife's family.

9. Boone did receive large sums of occupation money from an entirely different source in Manila to whom he issued receipts from December 1943 to August 1944. During this period he received from this source a total of 35,225 pesos. He not only acknowledged receiving these funds but he also designated them for use in the maintenance of headquarters and the promotion of guerrilla activity in the Bataan district over his signature on the receipts he gave to their source. Plaintiff did not contribute to this source of funds.

10. Sometime in 1943, plaintiff endeavored to ascertain whether Phillips was confined near Cabanatuan, a prisoner-of-war camp in central Luzon, where most of the Americans who had surrendered on Bataan were then imprisoned. To this end, she asked a member of a group of people who were in contact with certain officers confined at Cabanatuan to ascertain whether John Phillips was there. She received information that Phillips had died in the camp in July 1942. Thereafter, plaintiff gave small amounts to this group from her own funds and funds furnished by sympathetic residents of Manila from whom she solicited aid for the prisoners of war. Most of plaintiff's own contributions were for prisoners of war specified by her, whom she had known or heard of before the war.

11. In January 1942, the Japanese had confined allied nationals other than Filipinos in Santo Tomas University in Manila. For some time, the Japanese made no serious effort to feed these prisoners and they were dependent upon their friends outside. Many residents of Manila furnished food and comforts with the knowledge and consent of the Japanese.

A close friend of plaintiff was interned in Santo Tomas and from time to time plaintiff furnished her friend extras which could not be obtained in the internment camp.

12. When the surrender on Bataan took place, on April 9, 1942, the remnants of the surrendered United States Army were marched from the southern tip of Bataan to San Fernando and later transferred by train to a prison camp known as Camp O'Donnell. As a part of the effort of the Japanese to win the cooperation of the Filipinos, they began releasing first sick, then other Filipinos, from Camp O'Donnell. The relatives of the soldiers to be released were notified and permitted to go to the nearest railroad station, Capas, Tarlac Province, to assist the soldiers to return to Manila and to their homes. The Philippine Red Cross was also active in aiding these sick soldiers. Through the efforts of those who went to Capas, considerable information was received as to those who were confined at Camp O'Donnell. An underground was established whereby considerable aid by way of money, food, medicine, and clothing was gotten into the camp. Later the American prisoners were sent to a prisoner-of-war camp near Cabanatuan.

13. One group of civilians known as the Miss U group was perhaps the largest unit engaged in supplying aid to prisoners of war, and getting information to .friends and relatives of those prisoners. It was to this group that plaintiff applied to ascertain whether a soldier by the name of John Phillips was confined at Cabanatuan.

This group had started aiding the prisoners at Camp O'Donnell before the prisoners were transferred to Cabanatuan at about the same time Mr. and Mrs. Ramon de Amusategui were engaged in this work. Ramon de Amusategui was a Spaniard who had come to the Philippines and engaged in business there. His wife was a Filipina. For some time Mr. and Mrs. de Amusategui had been working with a Mering Bichara who was a Lebanese residing in Manila. She also had established contact with the prisoners of war confined in Camp O'Donnell. After the prisoners of war were moved to Cabanatuan, the need for aid to them became greater and Mr. and Mrs. de Amusategui decided that they would do more and with this in mind they joined the Miss U group which was a large and well organized unit. The Miss U group had been organized largely by Mrs. Utinsky, who was an American married to an American engineer working on Corregidor Island but who was later called to active duty as a Reserve captain. He was surrendered with General Wainwright on Corregidor and was later confined at Cabanatuan where he died. Mrs. Utinsky was a nurse and she had been active with the Philippine Red Cross in caring for sick and injured civilians in northern Bataan and in assisting the Philippine soldiers released from Camp O'Donnell.

The operations of the Miss U group were conducted under the direction of Mrs. Utinsky from her apartment in Manila until she was arrested by the Japanese in September 1943. Naomi Flores, a Filipino, engaged in this work with Mrs. Utinsky, traveled more or less regularly by train to and from Manila and Cabanatuan. Cabanatuan was the terminus of a railroad running north from Manila over a route about 75 miles long. Another Filipina named Evangeline Neibert went to Cabanatuan and posed as a resident of a town near the prisoner-of-war camp. She was permitted to sell fruits and vegetables and other small articles to the prisoners of war. While so engaged, she slipped notes to the prisoners and eventually a liaison was established between the Miss U group and certain prisoners, principally the doctors and the chaplains. Miss

Flores, on her trips to Cabanatuan carried a large fiber basket about the size of a shopping bag. In this bag she placed the money, notes, and other articles which were concealed by fruit and vegetables. These were transferred to Evangeline at Cabanatuan who succeeded in transferring the articles to the prisoners from whom she received notes and acknowledgments. The acknowledgments were important as the money was not coming wholly from the individual members of the group. Many residents of Manila knew of the operations and they would send money and articles to their friends in the camp and the acknowledgments made by the prisoners insured the success of the undertaking and continuation of the contributions. Most contributions, however, were sent to the doctors or chaplains either for specified prisoners or the most needy prisoners and frequently just to the general camp fund. Many well-to-do residents of Manila contributed large funds. In addition to furnishing of money and supplies to the prisoners at Camp O'Donnell and Cabanatuan, the group also furnished money and supplies in similar manner to prisoners of war confined at Nichols Field, Fort McKinley, Bilibid, and Los Pinas, in or near Manila.

14. The Japanese paid a small allowance to each prisoner of war for days spent working. The camp at Cabanatuan was well organized under imprisoned American officers. A camp purchasing agent or commissary officer was appointed and with permission of the Japanese, he would purchase medicine, along with foodstuffs, fruits, and similar articles for the prisoners of war to supplement the prison fare. The prisoners of war would frequently pool their money, which they received from the Japanese for working, or from other sources, and the purchasing officer would buy from merchants outside the camp. By the assistance of a native vendor who had a store near the camp, the Miss U group were able to send larger quantities of fruit and vegetables to the prisoners. This Filipino would sell the articles to the purchasing officer of the prisoners of war at greatly reduced prices and within the containers paper money in small denominations would be concealed, as well as notes, which would be taken into camp.

15. Mr. de Amusategui was arrested by the Japanese May 23, 1944, and later he died in Fort Santiago apparently after he had been tried, convicted, and condemned to be beheaded. Mr. de Amusategui, in addition to being the guiding genius of the Miss U group after he joined it, was active in the resistance movement against the Japanese. All those active in the resistance movement were known in the Philippines as "guerrillas", as well as those men who were armed and active in harassment of the Japanese Army.

16. Mrs. Utinsky was arrested by the Japanese in September 1943 and was confined by them some 32 days in Fort Santiago Prison in Manila. She was badly mistreated by the Japanese, who tried to force her to admit that she was an American. She was released in November 1943 and later joined the active guerrilla forces in Bataan Province. After her arrest, the group operated from the office of, and under the active leadership of Mr. de Amusategui until his arrest. Following his arrest, the delivery of money and supplies to the Cabanatuan camp continued for a very short time. Upon the insistence of the officers in the camp, it was discontinued as being too dangerous to those involved for the good that was being for the prisoners.

17. Plaintiff was arrested by the Japanese about May 23, 1944, and was charged by the Japanese with committing "harmful acts against the Imperial Japanese Government." She was charged under the name Dorothy Fuentes, and was sentenced to 12 years' imprisonment, without time off for good behavior, to expire on the 20th of November 1956. She was classified as a second-class military prisoner and on November 23, 1944, was sent to and confined in a women's correctional institution in the suburbs of Manila. She

was released February 10, 1945, by elements of the United States Army. Upon her release, she was taken to the internment camp at Santo Tomas for safe care until the fighting ended in Manila about February 23, 1945. She was returned to the United States on the S. S. John Lykes, a transport which was used to return Americans who had been interned by the Japanese. She was listed on the manifest as Claire Phillips with an illegible passport.

18. After her release, she changed a considerable amount of prewar Philippine currency into American money. This amounted to several thousand dollars, perhaps as much as $8,000.

She was returned to the United States as were the others, as being an American who had been confined by the Japanese. She arrived in the United States on May 2, 1945, and later resided with her husband, Manuel Fuentes, in San Francisco, California, until about January 1, 1946, at which time Fuentes returned to the Islands to work for the Quartermaster Department of the United States Army on an interisland steamship. At this time Fuentes made an allotment of his pay to plaintiff of $200 a month for six months. After plaintiff obtained a divorce from Fuentes in Portland, Oregon, in 1947, she married Robert Clavier from whom she was divorced in May 1954.

19. In October 1945, plaintiff filed a claim with the General Accounting Office under the name of Claire M. Phillips for $15,000, the alleged value of cash and goods to have been furnished by her to Major John P. Boone. This was broken down as follows:

| | |
|---|---|
| Cash | $ 6,000 |
| Clothing | 1,000 |
| Medicines, etc. | 3,000 |
| Food | 5,000 |
| | $15,000 |

In the affidavit filed with the claim, plaintiff stated that she actively served in the guerrilla forces.

In February 1946, plaintiff presented a claim to the War Department Claim Service as the value of property furnished by her as follows:

| | |
|---|---|
| Cash | ₱ 3,000 |
| Medicine | 5,000 |
| Clothing | 2,000 |
| Food | 20,000 |
| | ₱30,000 |

It was alleged in this claim that the property was carried by Isidro Pongeo, Major F. D., Philippine Army; Santiago Sadrad, Major, Inf. Philippine Army; and Mrs. Filomena C. Boone, from the Tsubaki Club in Manila to headquarters, Bataan, Military District, (recognized guerrillas) in the mountains of Bataan. It was alleged that the value was verbally agreed to by Captain John P. Boone, who issued receipts therefor.

The claim was in the name of Mrs. Claire Phillips and it was sworn to before a notary on February 13, 1946, in San Franciso, California. On December 6, 1946, the claim was denied by the Contract Claims Service "as the said supplies and cash loans were made on dates previous to the recognition date of said guerrilla unit as part of the Philippine Army."

Plaintiff's contributions to Boone's guerrillas and her contributions to the relief of prisoners of war did not exceed 8,500 pesos. All her contributions were made before May 23, 1944, and were procured by Japaneses occupation money.

Plaintiff's testimony was to the effect that her contributions were much greater than the amount of 8,500 pesos and included most of the contributions made by several others, particularly those made through the Miss U group which, she said, had her leadership and financial support. Her testimony in this respect like that of many other facts to which she testified is completely refuted by direct testimony of those who were active in this work during the time.

20. The Japanese occupation peso was at first accepted at the same value

as the Philippine peso. Commencing before January 1943, it began to depreciate and it finally became worthless in February 1945.

The depreciation was accelerated upon the landing of United States forces in Leyte in October 1944, after which time it was virtually impossible to exchange occupation pesos for Philippine pesos. Even before this, the Philippine peso had ceased to be in general circulation in the vicinity of Manila, as they were being hoarded. According to the Ballentyne Scale, which it has been stipulated may be used as fixing the value of occupation pesos, the ratio between those pesos and Philippine pesos from January 1, 1943 to May 30, 1944 varied from 1.05 to 12.00, an average rate for that period being 3.15 occupation pesos for one Philippine peso. The Philippine peso has had for a number of years the value of fifty cents in United States money.

21. On July 25, 1946, Congress enacted Private Law No. 781, authorizing the Secretary of the Treasury to pay to Brevet First Lieutenant Margaret Utinsky the sum of $9,820 in full settlement of all claims against the United States for money, goods, and supplies furnished and delivered by her to the Armed Forces of the United States between December 7, 1941, and August 14, 1945, (60 Stat. 1276). The Committee Report (House of Representatives Report No. 2302 June 20, 1946) shows that the amount of $9,820 represented the estimated value of the personal possessions which Mrs. Utinsky sold to procure the funds for the purchases of medicines, food, and supplies which she furnished to American prisoners of war at Camp O'Donnell, Camp No. 1, Cabanatuan, Nichols Field, McKinley, Bilibid and Los Pinas on Luzon.

22. On April 7, 1952, Congress enacted Private Law 529, authorizing the Secretary of Treasury to pay to Mering Bichara the sum of $25,000, in full settlement of all claims against the United States for money and supplies furnished and distributed by her to American prisoners of war in the Philippines during World War II (66 Stat. A40).

The Committee report (House Report 1041, dated September 25, 1951) shows that the bill which became Private Law 529, when introduced, proposed the payment of $83,615.88 which was supposed to be the approximate value of the Philippine pesos and Japanese occupation currency, food, medicines, and other supplies that Miss Bichara furnished for the benefit of American prisoners of war during World War II. The greater part of the currency consisted of Japanese occupation pesos which from 1943 to the cessation of hostilities in 1945, progressively depreciated in value until finally becoming worthless. While the matter was being investigated by the Department of the Army, where the bill was referred for a report, Miss Bichara offered to accept the sum of $25,000 in full settlement of the claim.

23. On August 11, 1955, Congress enacted Private Law 478, 69 Stat. A162, authorizing the Secretary of the Treasury to pay to Mrs. Lorenza O'Malley (de Amusategui) the sum of $20,000 and to each of her two children $5,000 in full settlement of all claims against the United States for money and supplies furnished and distributed by her and her former husband Ramon de Amusategui to American prisoners of war in the Philippines during World War II.

The Committee report (H.R. 2354, dated July 21, 1954) discloses that the sum of $30,000 was a rounded figure supposed to represent the claimed or appraised value of personal property disposed of to procure funds for the purpose, including $8,000 worth of personal checks and promissory notes which she had cashed or honored for prisoners of war. These checks and notes were destroyed at the time of arrest of Ramon de Amusategui to prevent their falling into the hands of the Japanese as damaging evidence against them and the prisoners involved.

24. All the above-named beneficiaries of Congress also received the Medal of Freedom as did plaintiff for meritorious

service which aided the prosecution of the war in the southwest Pacific.

25. On May 15, 1947, there was introduced in the Senate (Senate Bill 1295) a bill authorizing payment to plaintiff of $6,000 in full payment for money, medicine, and supplies furnished to guerrilla forces in the Philippines by plaintiff. The bill failed of passage.

On August 2, 1948, there was introduced in the House a bill (H.R. 7092) authorizing payment to plaintiff of the same amount for the same purpose. This bill failed of passage.

On February 19, 1951, there was introduced in the Senate a bill (S. 911) as follows:

"For the relief of Mrs. Claire Phillips Clavier.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the United States hereby recognizes its liability to Mrs. Claire Phillips Clavier, of Portland, Oregon, for reimbursement of money advanced out of her own funds and compensation for the fair value of funds, money, food, clothing, medicines, and supplies furnished by her, expenses of transporting same, to certain guerrilla forces and to the American or Allied inmates of Cabanatuan Prison, Bilibid Prison, and the Prisoner Detail at Nichols Field Work Detail, Manila Port Area Terminal, Fort McKinley, Los Pinas, and Santo Tomas Internee Camp in the Philippine Islands during the Japanese occupation. Jurisdiction is hereby conferred upon the United States District Court for the District of Oregon to hear, determine, and render judgment upon the claim of Mrs. Claire Phillips Clavier against the United States for such reimbursement and compensation.

"Sec. 2. Suit upon any such claim may be instituted at any time within one year after the date of enactment of this Act, notwithstanding the lapse of time or any statute of limitations. Proceedings for the determination of any such claim, and appeals from and payment of any judgment thereon shall be in the same manner as in the case of claims over which such court has jurisdiction under the provisions of paragraph 'Twentieth' of section 24 of the Judicial Code, as amended, but the $10,000 limit which is applicable in the case of claims over which such court has jurisdiction under the provisions of such paragraph 'Twentieth' shall not be applicable in the determination of this claim."

A bill of same import had been introduced previously in the 81st Congress (S. 2837) on which the Department of Justice had reported under date of July 3, 1950, and on the basis of that report a hearing was held October 2, 1951, before the Committee on the Judiciary of the U. S. Senate, and Resolution 293, referring S. 911 to this court, was adopted March 24, 1952.

### Recommendation

As will be noted, plaintiff made claim that she furnished large sums of money and a great deal in the way of supplies through John Boone, a noncommissioned officer who evaded capture when the surrender of Bataan occurred. Much of her story was greatly exaggerated, and at times almost fanciful. Her testimony as to these large sums and most of the supplies, as well as many other features of her story, was refuted by the direct testimony of those who were active in the work during the period covered by the claim.

For these reasons and because many details of her testimony were apparently incorrect, and also because of the methods she used to promote her claim, defendant asserts that plaintiff was guilty of fraud and that recovery should be completely denied.

It is true that many of plaintiff's statements and claims were later found to be without foundation. Yet when the rubbish is cleared away it is rather well

established by outside testimony that she furnished to prisoners of war and to organized guerrillas funds and supplies of the value of 8,500 pesos, which had a value of $1,349.21 in United States currency. This amount was furnished through a sergeant who evaded capture on Bataan and who organized some bands for resistance.

The plaintiff's sympathies and efforts were on our side in a time of great emergency. Regardless of the nature of some phases of her testimony we think in the circumstances she should be reimbursed for the amount which the record establishes she actually contributed in the manner indicated, to wit, $1,349.-21, and we so recommend to the Congress.

This opinion and the findings of fact will be certified to the Congress pursuant to Senate Resolution 293, 82d Congress, 2d session.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.